### J. F. ROWLEY CO. v. COLUMBUS PHARMACAL CO.

(Circuit Court of Appeals, Sixth Circuit. January 5, 1915.)

#### No. 2512.

1. PATENTS ⬤⟿328—VALIDITY AND INFRINGEMENT—ARTIFICIAL LIMB SUSPENDER.

The Rowley patent, No. 644,464, for an artificial limb suspender intended for use on artificial legs for amputations above the knee, which combines in one suspender passing over the shoulder a carrying strap slidingly attached to the thigh section, and slidingly connected to an operating strap attached to the leg or shin section, discloses invention; also construed, and *held* infringed.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. PATENTS ⬥162—EFFECT OF PATENT OFFICE PROCEEDINGS.**

Applicant foresaw the variation from his form which defendant subsequently made, chose language which well covered that later form, and explained to the Patent Office that the language was selected with that purpose and did have that effect. Thereupon the claim was allowed. *Held,* that the claim in the patent should receive the construction thus given by Office and applicant.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 237; Dec. Dig. ⬥162.]

**3. PATENTS ⬥155—EFFECT OF DISCLAIMER.**

When necessary to construe a claim limitation in order to determine the question of infringement, a specification disclaimer of an older patent will not control the meaning of the claim limitation, unless the respect in which defendant's device differs from the patent is the same respect in which the patent differs from the reference.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 227½; Dec. Dig. ⬥155.]

**4. PATENTS ⬥168—EFFECT OF PATENT OFFICE PROCEEDINGS.**

When the examiner inquired regarding the meaning of a phrase which might or might not limit a claim in a material particular, and the applicant explained that it was used in the broader and nonlimiting sense, and the Office acquiesced, and the patent issued, that may be sufficient to turn the scale in favor of the broader construction.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 243½, 244; Dec. Dig. ⬥168.]

**5. PATENTS ⬥172—DEFENDANT ACTING UNDER LATER PATENT.**

The existence of a later patent, under which defendant's structure is made, has no tendency to show noninfringement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 247; Dec. Dig. ⬥172.]

Appeal from the District Court of the United States for the Eastern Division of the Southern District of Ohio; John E. Sater, Judge.

Suit in equity by the J. F. Rowley Company against the Columbus Pharmacal Company. Decree for defendant, and complainant appeals. Reversed.

W. R. Rummler, of Chicago, Ill., for appellant.
C. C. Shepherd, of Columbus, Ohio, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. In this infringement suit, based on patent No. 644,464, issued February 27, 1900, to Rowley, for an "artificial limb suspender," the court below, assuming the validity of the patent, thought the claims must be so limited that there would be no infringement, and dismissed the bill. The plaintiff below, the owner of the patent, appeals.

While the ultimate disposition of the case must depend upon the construction of the claim in respect to an express limitation found therein, this in turn depends in part upon the advance which Rowley made over existing knowledge; and the inquiry may well be approached along the road adopted in Davis Co. v. New Departure Co. (C. C. A. 6, October 16, 1914) 217 Fed. 775, —— C. C. A. ——. This is

to inquire: First, what was Rowley's real advanced step or new concept? Second, is defendant's structure within the limits of such advance? And, third, if so, do the terms of the claim, when fairly read, require such an interpretation as to sanction defendant's appropriation of Rowley's idea?

[1] The controversy has to do with artificial legs for amputations above the knee, and comprising a thigh section, in the upper open socket end of which the leg stump is inserted, and, pivoted to the thigh section at its lower end, what is called in the patent the leg section (but which we hereafter call the shin), comprising the foot and the leg below the knee. To approximate natural conditions, two things must be accomplished: The thigh must be held to the wearer's leg stump and body so as to permit free motion at the waist and at the hip joint; and also there must be some means of controlling the action of the shin in addition to its mere gravity-caused oscillation. To hold the thigh in position, it was natural to carry over the shoulder a strap fastened to the front and rear of the thigh at its top, and as the front and rear straps would slacken and tighten with the motions of walking or sitting, and as the resulting chafing or rubbing over the shoulder would be troublesome, it would seem that this supporting strap might be, at the bottom, a continuous loop attached to the top of the thigh on one side and sliding through its point of attachment, so that the strap would remain always tight. This thought was elaborated by making the lower part of the strap in the form of a cord which would slide easily through guides or loops at the point of attachment, by providing two of such sliding attachments for the cord forward and back of the side center of the top of the thigh, and by doubling this arrangement on the other side of the thigh, so that there were either two separate loops and straps passing over the shoulder, or so that the strap depending from the shoulder was bifurcated; one section slidingly attached to the outside, and the other to the inside of the thigh near its top. All this had been done by Collins, in 1884 (patent No. 295,675), and by Winkley in 1887 (patent No. 371,239), as well as by others. These devices were carrying straps, and carrying straps only, and in each embodiment the carrying strap was not connected to the shin, save by that indirect connection which was inherent in the knee joint, and whereby, when the thigh was lifted and moved, the shin would swing by the force of gravity, sometimes aided by interposed flexor and extensor spring connections.

To accomplish the other necessary object, viz., control of the shin, various elastic and spring connections between thigh and shin had been provided, and a cord or strap attached directly to the shin and running upward over the thigh was not new. We cannot find that the idea of operating the shin through such cord by the voluntary movement of the upper part of the body had ever been clearly disclosed. Reichenbach, by patent No. 41,238 of 1864, had such a cord attached to a belt, and the belt was connected to a strap over the shoulder; but this seems to be a mere carrying device, and Reichenbach depended on the motion of the thigh to affect the shin. In the construction illustrated, it is possible that lifting the shoulder would have a tendency

220 F.—9

through this cord to swing the shin forward, but that is doubtful; and the idea never occurred to Reichenbach, so far as his specification indicates. Legran, by patent No. 52,057, of 1866, provided a cord attached to the front of the shin carried upward over the thigh and attached to a "breast plate," which in turn was held in position by a bandage passing under one and over the other shoulder. This cord and breast plate were entirely disconnected and separate from the carrying suspender. Legran's construction was more likely to permit some control of the shin through a shoulder movement than was Reichenbach's; but this idea had not occurred to Legran, unless he refers to that function when he says that his cord and his breast plate and shoulder bandage press the leg and hold it firm, "and they also greatly assist in the movements of the leg by the movements of the body of the wearer." Monroe, by patent No. 58,351, shows a flexible strap connected to the shin at front and sides, and passing up the front of the thigh; but he says that these straps are to sustain the weight of the limb, and that they are "firmly secured" to the thigh, so that obviously there cannot be any shin effect from a shoulder movement. Frees, No. 401,426, comes closer than any one else; but the motion of what corresponds to the lower loop of his strap was automatic, rather than voluntary, and if this motion operated the shin by the connection shown, that function was only vaguely disclosed, and was not known to Frees. He calls the connection a spring. We are inclined to think that this function of shin control through the raising of the shoulder cannot be found in any earlier device, except by uniting thereto the ideas first disclosed by Rowley; but, however that may be, certain it is that no one of these shin operating cords had ever been attached to or made unitary with the carrying strap passing over the shoulder.

In 1899, Rowley had been engaged for many years in the manufacture of artificial legs, and was actually familiar with all the devices on the market, and with the old patents which have been mentioned. It occurred to him that he could unite into one device the old carrying strap and an operating strap for the shin. He did this by cutting off the shin strap of Legran or Monroe just above the knee and throwing away all of it above that point, and at that point slidingly connecting it to the loop of the carrying strap, which itself was slidingly connected to the thigh. See his Figs. 1 and 2, below. Obviously, this amounted to taking the lower free end of the loop of the carrying suspender, between its front and rear points of sliding attachment to the thigh, extending or carrying this loop downward, and by sliding connection attaching it to the front of the shin at a point far enough below the knee so that a pull would be operative to straighten the knee. In the form which he showed in his drawing, the sliding connection between the carrying suspender and the thigh consisted of leather loops or guides through which the cord which formed the lower loop part of the suspender would easily slide, and the sliding connection between the carrying suspender and the shin consisted of a pulley at the upper end of the shin strap, through which pulley the carrying cord also passed intermediate of its front and rear attach-

ments to the thigh section.[1]   The result was that if, while the knee was bent, the wearer's shoulder was lifted, the depending loop at the bottom of the carrying suspender was correspondingly lifted, and the extensor cord reaching to the shin section correspondingly pulled, and the knee was straightened, while the compound sliding connection promoted ease of operation, and the pull upon the knee extensor cord was equalized between the front and rear parts of the carrying strap.

In one point of view (and if, indeed, the idea of an operating cord worked from the shoulder was not new) Rowley made only a slight change.   Carrying the lower end of the suspending loop down to a point of front attachment to the shin was only uniting in one strap the former functions of the two; but when he also provided a sliding connection with the shin, which permitted the carrying strap to accommodate itself to the wearer's motions just as freely as before and in spite of the added function, he displayed ingenuity which we think amounted to invention.   That it was not so obvious as might now be thought perhaps sufficiently appears from the fact that, though it has proved very useful and has greatly promoted the use of artificial legs, no one ever did think of it during the 33 years between 1866 and 1899; and, indeed, the thought might well have been discarded as impracticable, because it might seem that the same device could not be sufficiently tight to hold the thigh in position and sufficiently loose to permit the vertical shoulder motion necessary for operating the shin.   We are satisfied, also, that Rowley's real invention did not lie in any specific arrangement of the cords or straps or guides or pulleys.   These details of his device involved only skill and experience in exact places of attachment or precise selection of form.   The real inventive thought was that the sliding carrying cord could reach down and be, by a sliding connection, operatively united to the shin.

This conclusion is perhaps inconsistent with the opinion expressed by the District Court for the Northern District of Illinois granting a preliminary injunction based on this patent in Rowley v. Koeber, 135 Fed. 363.   The patent was there considered as resting on a narrower basis of invention; but it is to be observed both that the scope of the patent was not very material, since the defendant imitated closely, and that the opinion makes its result depend on its finding that "the combination of a leg holder and controller in one suspender is not new."   If this means that it was not new to combine in one suspender a leg holder or carrier and means of directly controlling the shin section by voluntary motion of the body, then it must be assumed to be founded on proof not in the present record.   In the instant case, the novelty of this combination is not disputed by expert or by counsel; indeed, defendant's superintendent and practical man and patentee in the patents under which defendant manufactures, and who had been engaged in the artificial limb business since 1880, says that as late as 1905 the Rowley suspender was the only one he knew of

---

[1] In his commercial form, Rowley departed from his patent drawing by not crossing the straps but running them straight down, as indicated by the dotted lines which have been added to Fig. 2.

that was intended to accomplish the purpose of controlling the shin by means of the shoulder movement.

The defendant has used two forms of artificial leg, said to infringe. The first form has been abandoned, and we pass to the second, which is here shown by the side of Figs. 1 and 2 of the Rowley patent.

Rowley          Rowley          Odgers
Fig. 1          Fig. 2          (Deft.'s)

In this second form, the lower loop of the carrying cord (*4*) passes through and depends between front and rear points of sliding attachment to the thigh (*12, 11,* in front and *7, 8-26* in rear). This loop itself, without any flexible strap, is then carried down and passed around a pulley (*9*) on a pivoted bar (*10*) attached to the shin four or five inches below the knee joint (*3*). By reason of the swing of the lower end of the thigh within the upper end of the shin section in the knee-bending motion, the knee joint or pivot is situated several inches above the lower end of the thigh, and defendant has selected for its lowermost rearward point of sliding attachment to the thigh section a point near this pivot. The cord here passes through a guide upon the outer surface of the thigh. This guide consists of a bracket (*26*) opposite a grooved pulley (*8*) mounted loosely on the pivot bolt (*3*), which is, for that purpose, projected outside of the leg surface. Plainly, what we have considered as Rowley's essential idea is incorporated in this construction. The only difference between it and the form shown in Rowley (except a detail hereafter discussed) is

that the sliding connection between the carrying loop and the shin is made by extending the loop downward and passing it through a pulley on the shin instead of passing it through a pulley on a strap attached to and extending upward from the shin; and this is no departure from the substance of the Rowley invention.

[2] The remaining question is whether the claims are broad enough to protect the invention against this appropriation. There are three claims in suit, 1, 3, and 4. The first is given in the margin.[2] The second is to the same effect, with the expressed qualification (probably implied in the first) that the point of connection to the shin is between the two points of sliding attachment to the thigh; the fourth specifically calls for the strap as the means of connecting the shin to the carrying loop. The first limitation suggested upon claim 1 is that the reference in the claim to "a loop slidingly connected to the leg section" must be confined to a strap connection, as shown in the drawing, and does not extend to the somewhat more direct connection used by defendant. It would be a sufficient answer that in defendant's actual construction a strap is employed, the only difference being that the strap is made of metal and is short, not extending above the knee; but it is further clear that neither the language employed nor the state of the art requires this limitation, and that its presence is almost necessarily negatived, by comparison with claim 4, which is differentiated alone by the inclusion of this limiting feature. If, still, there could be doubt, reference to the Patent Office proceedings shows that the examiner objected to claim 1, because the invention was definitely set forth in (present) claim 4, and because he did not see that claim 1 could refer to any structure which did not contain the strap and which could, at the same time, be operative. He referred to the strap as the "element in which, in view of the state of the art, applicant's entire novelty is held to rest:" In answer to this action, applicant said:

"The strap 7 might be omitted entirely in making an operative device like applicant's invention. By providing a staple, an eye, or a ring for the upper front part of the leg section, the loop 5 might pass down through said staple, eye, or ring. In such case, the loop 5 must have a sliding movement through said staple. The device will not operate as well in this form as in the form shown, but would be an embodiment of applicant's invention, and applicant is therefore entitled to a claim covering same."

Applicant foresaw the variation from his form which defendant subsequently made, chose language which well covered that later form, and explained to the Patent Office that the language was selected with that purpose and did have that effect. Thereupon, the Patent Office allowed claim 1. After this common construction of the language by both parties, no room for doubt as to its meaning, in this respect, remains.

[2] "Claim 1.—The combination of an artificial limb comprising a thigh section and a leg section, pivotally connected together, a suspender comprising a loop slidingly connected to the leg section independently of said pivotal connection and adapted to pass over and be supported on the shoulder of the wearer, and guides on said thigh section slidingly engaging said loop, all arranged to swing the leg section forward on its pivotal connection, through an upward tension on said loop."

The other matter of claim limitation gives far more trouble; indeed, the natural impression is that the limitation exists, and only a further study has led us to the opposite conclusion. The claim, after a reference to the pivotal connection between the thigh and leg [shin], requires that the loop should be slidingly connectd to the shin "independently of said pivotal connection." The defendant makes the loop run over—and, in certain motions, bear upon—a pulley which is in fact mounted on and thus physically connected to the knee pivot; and so defendant says that it has not made the connection between loop and leg section "independently of said pivotal connection."

·It is of some significance that the mounting of this pulley on the knee bolt is fortuitous, or, at most, only a matter of mechanical convenience. There is no inherent functional relation between them. The pulley, as a pulley, is of no importance, save as an anti-friction device. It forms a part of the guide which slidingly engages the loop, and which guide might be mounted on the thigh at any other point in this vicinity as well as directly in line with the knee bolt. That this is true, and that the guide of which the pulley forms one side is in real effect mounted on the thigh, and not upon the knee bolt itself, is demonstrated by the exhibit in which defendant's structure has been altered by cutting off the knee bolt flush with the outer surface of the thigh and carrying the pulley in the same position, but without any physical connection with the knee bolt, and mounted wholly upon the thigh. It operates precisely as before the change was made, and shows that nothing was gained by the physical connection between pulley and knee bolt, except perhaps strength. In effect, and because thigh and shin sections here overlap, defendant found the end of the knee pivot projecting through the surface of the thigh section, and used that projection as a convenient means of mounting its loop guide on the thigh.

This dissection of defendant's structure strongly suggests that defendant's connection of the loop to the shin is really made "independently of" the knee pivot, in every fair sense of the word "independently"; but another reason leads to the same result. In all the earlier · cases' of carrying suspenders, the shin was "connected" to the suspender through the medium of the knee pivot. This was an indirect connection, but distinctly operative. The suspender loop, in moving the thigh forward or back, caused the shin to move correspondingly. This was because there was a secondary connection, through the knee pivot. Rowley, for the first time, connected this loop to the leg section more primarily or directly; that is, without relying upon the knee pivot as the means of the connection. That means still remained, and still had its indirect effect; but his idea was to control more completely the action of the shin in response to the loop, by providing a further and more direct connection—which he did by means of his strap, and which the defendant does by carrying the loop itself down and attaching it to the shin. This connection is made "independently of" the knee pivot, and there is nothing on the face of the patent which prevents giving merely this meaning to the phrase in question, and assuming that it means "connected directly and by means in ad-

dition to the knee pivot." If it is entitled to bear this meaning, then defendant does not escape infringement merely because its loop on its way to a point of direct connection with the shin is brought into indirect and really nonfunctional physical contact with the pivot.

[3] Aside from the descriptive language itself, there are two considerations bearing on the propriety of this construction. One is the disclaimer found in the specification in these words:

"I am aware of the patent to Reichenbach, of January 12, 1864, and do not claim the construction therein shown."

Reichenbach carries his shin-operating cord down through guides on the thigh and then over a pulley mounted on the knee bolt. In this respect, his structure is essentially like defendant's; and the Reichenbach disclaimer might mean that Rowley distinguished from Reichenbach because the Rowley loop did not run over a pulley on the knee bolt. If the differentiation in this respect was the only office properly attributable to the Reichenbach disclaimer, it would be controlling upon the meaning of the claim limitation now being examined; but this was not the only point of difference, and so this was not, necessarily, the difference on which Rowley was depending. Reichenbach did not have at all the combination of the carrying suspender and the operating suspender which was the real essence of Rowley's invention; to this difference the disclaimer attaches, and by it the disclaimer is satisfied. Indeed, since it was perfectly obvious that Rowley did not use the knee joint and pulley construction, there would have been the less reason for making a disclaimer directed to this point. It follows that the Reichenbach disclaimer, while somewhat persuasive towards giving to the claim limitation a construction which will exclude defendant's device, is only persuasive, not convincing; and even this persuasiveness is removed by examining the file wrapper contents. It there appears that the limitation had been inserted in the claims and had been interpreted as is below recited before Reichenbach was cited as a reference. It was, in fact, inserted to distinguish from Gault, who had only an indirect connection through the joint.

[4] The other consideration is that the very question was raised in the Patent Office. The examiner, at one point, said:

"Why was the clause 'independently of said pivot connection' introduced in the claims? Does any reference show a connection to the pivot, or could the suspender operate at all if connected to the pivot? By the pivot, we understand the applicant means the knee joint."

Applicant replied:

"Applicant's object in inserting 'independently of said pivotal connection' * * * was merely to definitely distinguish between the connection of the loop whereby the leg [shin] is moved, and the connection which exists indirectly through the thigh section."

Without further objection in this respect, the claim was allowed and the patent issued. Here, again, we have a problem of construing ambiguous language in the claim, and we find that applicant explained what it did mean, distinctly giving it the broader of two possible constructions, that the examiner acquiesced, and that the patent issued. Of course, such a statement by an applicant, made argumentatively

and merely acquiesced in or possibly overlooked by the examiner, could not avail by way of estoppel against the public to make a claim broader than it reads; but we see no reason why it is not sufficient to turn the scale in favor of the broader construction, as against doubtful inference and inconclusive argument, when the only question is whether the claim shall have a breadth which its language fairly permits, and which is necessary in order that it be commensurate with the actual invention. We conclude that in this claim "independently of" means "not relying upon, but by means in addition to," and that defendant infringes.

Stress is put by defendant's counsel and expert on the claim that by running the cord over a pulley on the knee pivot defendant gets a "leverage" which greatly increases the ease of moving the shin, and demonstrates that he employs a different principle from that used by Rowley. So far as we can comprehend this claim, we think it has no force. There is really no question of leverage involved, because there is no lever. Mechanically, the shin is a crank, of which the knee pivot is the shaft and the crank axis is the straight line passing from the pivot down through the point where the cord is attached to the shin. True, in a precise sense, a crank is a lever, and the exact center of its shaft is its fulcrum; but, in that sense, the "leverage" would depend on the distance between the knee pivot and the point where the cord pulls on the shin, and clearly this is not what the defendant is talking about. The real problem is one of angle—one of direction of pull. Its force will be greatest if at right angles to the swinging shin, and will decrease as the angles diminishes, reaching *nil* when the pull is in a direct line. It follows that, if the thigh-bearing point of the pulling cord was exactly at the center of the knee pivot, there would be no leverage whatever; the crank would be on the dead center. Out of the pull of this cord, defendant gets *no* "leverage," excepting as it moves its bearing point away from the pivot; and this it does only by the length of the radius of the pulley revolving on the pivot. All this is only confusing, because, in truth, this "leverage" or efficiency of pull depends on the angle between the supposed crank and a line from its cord attachment to the cord's effective bearing point on the thigh. That effective bearing point will be midway between the two actual bearing points—the loops or points of sliding engagement—and, manifestly, will change as the shin swings. The extent of the desired forward pull will, at each moment, depend on the average distance by which the two thigh attachment points are forward of the shin crank line projected upward. When defendant moved one of these points—the bearing edge of its knee pivot pulley—back almost to this dead center line, the "leverage" was diminished, not increased. The fact is that defendant's pulley contact with the cord simply insures that when the knee is bent this cord cannot fall back so that the pull will be in the wrong direction, and insures that at least one bearing point shall always be forward of the shin axis. Rowley got the same result in his patent by making his straps cross over the front of the knee, and in his commercial form by anchoring the strap so it could not fall back too far.

[5] Defendant was manufacturing under later patents granted to its superintendent. We have had occasion to hold that the existence of such later patents, while they imply that defendant's structure made thereunder embodies patentable improvement over plaintiff's device, yet have no tendency whatever- to show noninfringement. Herman v. Youngstown, 191 Fed. 579, 584, 112 C. C. A. 185. If there are exceptions to this rule, as was intimated in the case cited might be possible, the present case is not one of them. Each of defendant's patents is directed to the details of its construction; plaintiff's whole theory is that his patent is relatively generic. If that theory is wrong, he has no case; if that theory is right, it makes no difference how many patents have been granted to others for later modifications.

The decree must be reversed, with costs, and with directions to order the usual injunction and accounting.