## J. F. ROWLEY CO. v. CHESTER B. WINN, Inc.

### No. 1113.

District Court, W. D. New York.
Oct. 16, 1929.

Rummler & Rummler, of Chicago, Ill. (William R. Rummler and Walter Boye, both of Chicago, Ill., of counsel), for plaintiff.

John S. Powers, of Buffalo, N. Y., for defendant.

ADLER, District Judge.

The Rowley patent in suit No. 961,165 was obtained June 14, 1910, on an application filed October 15, 1906. Defendant is sued for infringement on two legs of different construction, namely, Plaintiff's Exhibit 3, alleged to infringe claims 2, 3, 5, 6, 8, 9, 11, and 12, and Defendant's Exhibit 24, alleged to infringe claims 2, 11, and 12.

In order to understand the Rowley invention it is necessary to go back to an earlier patent issued to Rowley on February 27, 1900, No. 644,464, the application for which was filed July 15, 1899, and which has now expired. This patent is in evidence, and it appears that its claims covered broadly a positive control of a leg section pivoted to a thigh section by employing a suspender with a loop slidingly connected with the leg' section, and more specially a sliding connection with the leg section consisting of straps attached to the leg section and sliding on the loop. An interference between Martin and Rowley, decided by the Court of Appeals of the District of Columbia on June 4, 1909, and reported 146 O. G. 722; is also important to an understanding of the case. The first Rowley patent, No. 644,464, was passed upon by the Circuit Court of Appeals of the Sixth Circuit on January 5, 1915, J. F. Rowley Co. v. Columbus Pharmacal Co., 220 F. 127, 128. The Court of Appeals of the District of Columbia also passed on the patent in suit in J. E. Hanger, Inc., v. J. F. Rowley Co., 54 App. D. C. 336, 298 F. 359.

As expressed by the Court in Rowley v. Columbus Pharmacal Co., construing the first Rowley patent (No. 644,464): "While the ultimate disposition of the case must depend upon the construction of the claim in respect to an express limitation found therein, this in turn depends in part upon the advance which Rowley made over existing knowledge; and the inquiry may well be approached along the road adopted in Davis Co. v. New Departure Co. (C. C. A. 6) 217 F. 775. This is to inquire: First, what was Rowley's real advanced step or new concept? Second, is defendant's structure within the limits of such advance? And, third, if so, do the terms of the claim, when fairly read, require such an interpretation as to sanction defendant's appropriation of Rowley's idea?"

Turning first to the decision of the Court of Appeals of the District of Columbia in the *interference* between Martin and Rowley with respect to the subject-matter of the Rowley patent in suit, No. 961,165, we find that the counts of the interference were two, and that they are identical with claims 8 and 9 of the Rowley patent as subsequently issued. We find in the opinion of the court the following statement with respect to the invention, namely: "The invention is narrow in scope and resides in a changed location of the connection between the suspender and leg-section of an artificial limb."

On examining counts 1 and 2 (claims 8 and 9 of the patent) we find the "connection between the suspender and the leg section" defined as follows, namely, in claim 8 as "a lever fulcrumed in the thigh section and having upper and lower arms, the lower arm being connected with the leg section," and in claim 9 as "a lever mounted on said pivot and having an upper arm arranged wholly within the thigh section and a lower arm extending downwardly through the slot of the thigh section into the leg section and secured to the latter."

In this interference it was brought out that Rowley as early as 1897 was a manufacturer of artificial limbs and an inventor in that art. That Martin entered his employ in 1897 without mechanical training and remained until January 11, 1906, when he entered the employ of the Queens City Artificial Limb Company, of Buffalo, N. Y., with which Mr. Winn, of Chester B. Winn, Inc.,

defendant in this suit, was connected. Martin claimed to have conceived the invention in December, 1904, but the court found that there was no evidence outside of his own testimony that he disclosed it to any one prior to January, 1906, when he entered the employ of the Queens City Company. The decision in the interference was accordingly in favor of Rowley.

Coming to the decision of the Court of Appeals of the District of Columbia in the Hanger Case, for the infringement of the Rowley patent here in suit, No. 961,165 (54 App. D. C. 336, 298 F. 359), we find that all of the claims here in suit were before the court in that case with the exception of the fifth claim. In that case the court gave Rowley credit for uniting into one device the old carrying straps and the operating shin straps in such a way as to permit the control of the shin section by the raising or lowering of the shoulder, referring to the fact that that was the subject of the earlier patent No. 644,464, and citing in support of this statement the decision in the Columbus Pharmacal Co. Case, referred to above. In the opinion in the Hanger Case the court then proceeded to trace the origin of the invention leading to the patent in suit, No. 961,165, going back to the "Sexton Leg," made by Rowley in 1900, which, says the court, "contained a back check substantially the same as that disclosed in Figure 1 of the patent in suit." This "Sexton Leg" was held by the court to constitute a reduction to practice of Rowley's idea, inasmuch as it was thereby put into concrete form and demonstrated to his employees. The court accordingly held that the invention was not abandoned through Rowley's delay in filing his application, namely, from June, 1900, to October, 1906.

Coming to the question of the scope of the patent No. 961,165, the Court of Appeals in the Hanger Case pointed out that (54 App. D. C. 336, 298 F. 359, 361): "While the earlier patent *covered broadly the idea of the combination* of the *carrying suspender and operating suspender,* so as effectually to control the shin section by voluntary movement of the shoulders, the specific embodiment of that invention was an outside control; that is, a control resulting from attachment of the lower projection of the suspender to the outside of the shin section." (I have added the italics.)

The court then goes on to say:

"Claims 2, 3, 11, and 12 of this patent purport to cover a combination effecting the control we have described by a connection 'through the interior of the thigh section, instead of being made outside of the knee joint,' while claims 6, 8, and 9 require that the extension loops 9 shall be operatively connected to a back check at a point within the thigh section. * * *

"Back checks per se were old (limiting the forward movement of the leg section on its pivotal connection to a position in alignment with the thigh section), but that of Rowley is so designed as to perform the *double function* of a back check and a lever, to the upper arm of which the *extension cords 9 are attached.* * * *

"The extension loops 9, it will be seen, are connected with a forward projection of the back check at 8, and in this way is obtained the leverage necessary to control the shin section. This extension (projection) is the element mentioned in claim 9 as 'a lever mounted on said pivot,' the pivot being the connection between the upper and lower leg sections. It thus appears that what Rowley had in mind was a combination of the elements set forth in his claims, in which *the lower extensions* of the suspender are so attached to a *lever* inside the thigh section as to make possible control of the shin section, as described." (The italics and words in parentheses have been added.)

In the Hanger Case defendant's structure is shown by a cut at 54 App. D. C. 336, 298 F. 364, and it is stated by the court on page 364 that the Hanger Company copied the "essential elements of the Rowley device" inasmuch as in the Hanger device a back check in the form of a lever is attached to the knee pivot within the thigh section and the lever in turn has operative connection with the suspender. In the Hanger Case, in referring to the defendant's construction, the court remarked that: "The *function* of the back check (defendant's) is exactly the same, and its presence or absence (in defendant's device) does not affect the real invention, namely, the lever attachment." (The italics and parentheses are mine.)

It will be observed that the appeal both in the interference and in the Hanger Case was to the Court of Appeals of the District of Columbia. It is apparent from the decisions of that court in these two cases that the invention was considered by the court to consist broadly in "changing the location of the connection between the suspender and the leg section of an artificial limb" to a location inside the thigh section, and specifically in employing in that connection a device having "the double function of a back check and lever to the upper arm" of which a connection

is made to the suspender, through a suspension loop slidingly connected to said thigh section.

In the suit at bar there are two devices claimed by plaintiff to infringe, in evidence as Plaintiff's Exhibit 3 and Defendant's Exhibit 24. In Plaintiff's Exhibit 3 the shin member of the leg is operated by a lever located within the thigh section and having attached thereto cords that pass out through openings in the front and rear of the thigh section and over the shoulder of the wearer in the form of a suspender loop. See Winn patent, No. 1,115,361, Rec. p. 304. Defendant's Exhibit 24 is a leg characterized by a continuous suspender loop that passes into the interior of the leg and is connected with the shin section without employing an extension, like the straps 9 of the patent in suit, so as to enable the user to control the movement of the kneejoint. The only theory on which infringement of a patent by this last construction (Defendant's Exhibit 24) can be maintained is that broadly speaking it employs the same principle of leverage as the patent in suit, and that in both cases this is located within the thigh section and has operative connection with the shin section and with the suspender.

The patents of the prior art in this case are the same as those considered by the court in the Hanger Case, but the different considerations to be taken into account in this case in determining the question of infringement with respect to Plaintiff's Exhibit 3 and Defendant's Exhibit 24 makes it necessary to interpret the claims anew with respect to the patents of the prior art. Furthermore, there has been introduced into this case as a part of the prior art the Ledwin leg, not in the Hanger Case, shown in the chart in evidence as Defendant's Exhibit 19 (Rec. 247), in which the parts are identified by the letters. The Ledwin leg has been carried back to July, 1904, whereas the application for the Rowley patent in suit was filed more than two years later (June, 1906). There is evidence in the case to support plaintiff's contention that the Ledwin leg was in fact made and sold in the summer of 1914 instead of June, 1904, as claimed by defendant. On due consideration, and for reasons that will presently be explained, it has been decided to accept the Ledwin leg as a prior use dating from July, 1904. This Ledwin leg is operated on the same principle, and in structure is substantially the same, as Defendant's Exhibit 24, one of the legs on which suit is brought. The Ledwin leg is, therefore, also a structure in which a suspender loop is passed into the interior of the leg and

there so attached to the shin section as to enable the user to control the movement of the kneejoint. Any interpretation of the claims of the patent in suit that will make them read on Defendant's Exhibit 24 will also make them read on the Ledwin leg, and, accordingly, render them void by anticipation. Inasmuch as claims 2, 11, and 12, alleged by the plaintiff to be infringed by Defendant's Exhibit 24, are claimed to be generic to the lever construction of the Rowley patent, which Plaintiff's Exhibit 3 is claimed to imitate, and the cord control common to Defendant's Exhibit 24 and the Ledwin leg, it is permissible to eliminate them from further consideration, but, nevertheless, they will be considered in discussing infringement by Plaintiff's Exhibit 3.

Coming to a consideration of the claims (2, 3, 5, 6, 8, 9, 11, and 12) alleged to be infringed by defendant's leg in evidence as Plaintiff's Exhibit 3 and substantially the same as the leg shown and described in Winn patent, No. 1,115,361, in the arrangement of the control strap and its relation to the back check (Rec. 340), I find as follows:

Claim 2 is infringed by defendant's device (Plaintiff's Exhibit 3) unless either invalid in view of the Ledwin leg and the Morris patent, or limited thereby to construction having a suspender provided with a loop that in turn is provided with a strap that enters the sides of the thigh section for connection with a lever. What Rowley had in mind obviously was to mount a lever in the thigh section with an arm extending down into and attached to the shin section, and combine this lever with the same suspenders that are shown and described in his expired patent, No. 644,464. These suspenders are characterized by loops slidingly connected to the thigh section by guides and straps that engage at one end the loops between the guides and at the other end engage in the shin section. In order to effect this combination it was necessary to pass the lower end of each of these straps 9 into the thigh section, through an opening 10 on the side of the thigh section and attach it to an arm on the lever.

The Ledwin leg employs a suspender that consists of a continuous loop that extends over the shoulder of the wearer to form a shoulder strap and also into the thigh section at the rear, when, instead of being connected with a lever to operate the shin section, that result is accomplished by passing the loop down into the shin section around a guide pin 11, and thence upwardly and along the front of the thigh section. See the chart,

Defendant's Exhibit 19, and Dorsey's explanation, Rec. 273–275. With the Ledwin leg in the prior art, showing how the straps may be carried into the interior of the thigh section, Rowley is not entitled, in view of Morris, to claims that cover broadly means operatively connected with the loop for swinging the leg section. Claim 1 is such a claim, and it has not been sued on. If the language of any of the claims in suit can be interpreted to have that meaning, they are invalid, or should be limited to a form of suspender that employs loops and straps such as characterize Rowley's suspenders, and which require as an incident for the successful operation of a suspender of this form openings on each *side* of the thigh section, as described in the patent in suit (and specified in claim 9) to admit the straps for attachment to the lever.

Plaintiff's Exhibit 3 (Defendant's device) employs suspenders of the form of those attached to the Ledwin leg in which the suspender loop itself is carried into the interior of the thigh section, and therefore necessarily enters through openings in the front and rear. Rec. 299.

It follows, therefore, that the claims in suit must be limited to the combination with a lever located within the thigh section, of suspenders of the form shown and described in the patent suit, having loops and straps slidably connected therewith, as by pulley, the latter passing through openings in the sides of the thigh section for attachment to the lever.

Claims 2, 3, 5, 6, 9, 11, and 12 are therefore invalid, in view of the Ledwin leg and the Morris patent, unless limited as stated above, in which case they are not infringed by Plaintiff's Exhibit 3.

Claim 8 is invalid, in view of the Morris patent alone.

In some of these claims the element that intervenes between the straps *9* and the shin section is referred to generically as "a member extending upwardly from the leg section into the interior of the thigh section" (claim 2), and as "intermediate means connecting said extension (strap) with said leg section" (claim 3). In some of the claims this intermediate operating element is described as comprising "a knee bolt extension extending across the thigh section at said pivot connection and a back check of rigid material extending from the leg section to the interior of the thigh section." Claim 5. Claim 6 has the same description, but adds that the connection between the suspender loop and the lever is made "at a point removed from the axis of the pivotal connection of the sec-

tions." In claim 8 this element is described as "a lever fulcrumed in the thigh section and having upper and lower arms, the lower arm being connected with the leg section." In claim 9 this element is described as a lever mounted on said pivot (the pivot around which the leg section revolves) and having an upper arm extending wholly within the thigh section and a lower arm extending downwardly through the slot of the thigh section and the leg section and secured to the latter. In claim 12 the only reference made to this element is that it constitutes a "rigid connecting means between said extension and said leg section," a description which obviously applies also to the lever of the Morris patent.

It is apparent, on comparing the lever mechanism of Plaintiff's Exhibit 3 (defendant's leg in suit), shown in patent to Winn, No. 1,115,361, with the lever of the Rowley patent in suit, No. 961,165, and also with the lever of the Morris patent of the prior art, No. 803,922, that the lever of defendant's leg resembles the Morris lever more nearly than it does the Rowley lever, both in form and in the manner in which it is mounted within the thigh section of the leg. In my opinion it would be apparent to a mechanic how to introduce in the hollow shank of defendant's leg a lever such as that shown in the Morris patent, and, if it was desired to operate it by a suspender loop extending over the shoulder and down into the interior of the thigh section in the manner of the Ledwin leg, the connection with the operative arm on the lever would naturally be made within the leg. In the Morris leg the thigh section is solid, except for the slots *H* formed in its lower end to make it possible for the lever *K* to swing, in order to operate the lever. That construction made it necessary to attach the straps to the operating levers on the outside of the shank. If a similar lever is placed within a *hollow* shank, such as that of defendant's leg and the Ledwin leg, and is connected up with the suspender loop, after the loop has been carried into the interior of the shank member through the holes in its side, as in the Ledwin leg, the connection must necessarily be made with the arm of the lever within the interior of the thigh section, and at one side of the pivotal connection. See claims 2, 5, 6, 9, 12.

In brief, it does not appear that in devising the lever mechanism shown and described in the patent in suit Rowley solved a problem involving the use of lever mechanism for that purpose at that point, which has been appropriated by the defendant in the construction of Plaintiff's Exhibit 3. And, with the Ledwin leg in evidence, it does

not appear that Rowley contributed anything to the art by connecting the straps from the suspender loops to the lever mechanism at a point within the thigh section.

And so as the result of this analysis I find, as stated by the Court of Appeals of the District of Columbia in the interference between Martin and Rowley on the subject-matter of this patent, that "the invention is narrow in scope and resides in a changed location of the connection between the suspender and leg-section of an artificial limb," but that, when the Ledwin leg (not before the Court of Appeals in the interference) is considered with the Morris patent, invention was not involved in bringing about this changed location through the instrumentality of a lever located within a hollow shin section.

Ledwin has testified to having purchased and worn five legs, all of which have been accounted for, namely: The Hall leg purchased in 1893, Defendant's Exhibit 26; first Winn leg, which Defendant's Exhibit 2 is claimed to be, purchased in 1904; a second Winn leg purchased in 1914, and said to have been destroyed in 1919; a third Winn leg purchased in 1919, and which at the time Ledwin testified he was holding as a spare or extra; and a fourth Winn leg purchased in 1927, and which Ledwin was wearing at the time he testified. Ledwin testified that the leg which he purchased from Mr. Winn in July, 1904, Defendant's Exhibit 2, was paid for by check bearing the date of delivery, and which he gave Mr. Winn when the leg was delivered to him by Mr. Winn at the latter's place of business. This check, made out by Dr. John T. Claris to Mr. Winn's order, is in evidence as Defendant's Exhibit 1. Ledwin is corroborated by Winn as to all of the legs which Ledwin has worn and as to the check. A copy of the check stub is also in evidence as Defendant's Exhibit 23. Ledwin and Winn are corroborated by Charles G. Nicholson, employed by Winn from 1904-1908, inclusive, and now again in his employ. Nicholson recalls the leg purchased by Ledwin during his (Nicholson) first period of employment as having an inside control and as being the first leg of that type manufactured by Winn. Nicholson further testified that he saw this leg, Defendant's Exhibit 2, fitted to Mr. Ledwin, at which time Winn explained the inside control mechanism to him (Nicholson). Also that he (Nicholson) finished the leg. He also swears that, at the time Ledwin purchased this leg, he was wearing the Hall leg, Defendant's Exhibit 26. He also testifies that he himself applied the scroll work on this Ledwin leg, that the scroll work was suggested to him by Mr. Winn, and

that this was the first leg on which he worked that had such scroll work on it. Mr. Winn identified Defendant's Exhibit 2 as the leg that he made for Ledwin in 1904. He identifies Defendant's Exhibit 26 as the Hall leg which Ledwin purchased in 1893. He testifies that the Ledwin leg, Defendant's Exhibit 2, was paid for by the check, Defendant's Exhibit 1, and that it was delivered to Ledwin at the time of the delivery of the check. Winn produced records of all four of the legs that he made for Ledwin. A record card in evidence as Defendant's Exhibit 30 is of Ledwin leg, Defendant's Exhibit 2. The measure blank for this leg is in evidence as Defendant's Exhibit 31. The record card, Defendant's Exhibit 30, for Defendant's Exhibit 2, bears no number. Record cards for the later legs bear numbers. Winn testified that he started to number legs at the instance of an employee named Martin who came to work for him in 1906 or 1907, and explains the absence of the number on record card 30 for Defendant's Exhibit 2 by the fact that this leg was made and sold before that time. The fact that the Ledwin leg, Defendant's Exhibit 2, was purchased by Ledwin from Winn and worn by him is not questioned. Neither is it questioned that the Ledwin leg, Defendant's Exhibit 2, is in substantially the same condition as when purchased from Winn. It is, however, disputed that Ledwin purchased this leg, Defendant's Exhibit 2, from Winn in July, 1904, and claimed that the leg, Defendant's Exhibit 2, is the leg purchased by Ledwin from Winn in the summer of 1914. In support of its contention that Defendant's Exhibit 2 was made and sold by Winn to Ledwin in 1914, plaintiff produced as a witness Beck, who testified that he himself made the Ledwin leg in 1914, and disclosed, on taking apart the Ledwin leg, Defendant's Exhibit 2, that it has the number 2093 stamped on the inner face of the metal straps where the number is not visible until the leg is taken apart. According to the numbering system introduced by Winn in or about 1907, the number 2093 would indicate that the leg was made in 1914. In attempting to show that the presence of this number 2093 on Ledwin leg, Defendant's Exhibit 2, is not inconsistent with the testimony of Ledwin, Winn, and Nicholson that Defendant's Exhibit 2 was made and sold by Winn to Ledwin in 1904, defendant produced the witness Kraft, who testified that he entered Winn's employ on May 25, 1914, was in his employ until 1917, and was in his employ at the time he testified. Kraft did not know how or when the number 2093 came to be placed on the inside of the strap of Defend-

ant's Exhibit 2, or by whom it was done, but explained that he himself saw this leg brought into the Winn factory twice by Ledwin in 1914. That the second time he himself did a repair job on it, and that at that time (1914) it was a practice in the Winn shop to number the parts of an old leg taken down for repair, for the purpose of identification, and that it was customary to give to the parts the number of the most recent purchase of the customer appearing on the order cards, and to keep the parts together in a box to which the same number was applied. Kraft testified that he was working alongside of Beck at this time in 1914. That Beck himself did the first repair job on the Ledwin leg, Defendant's Exhibit 2, in July, 1914, and part of the repairs made on it in November, 1914, when Ledwin brought it back. Kraft identified Ledwin in court and testified that, when the Ledwin leg was brought in for repairs the second time, Beck, after he had done some work on it, gave it to him (Kraft) to be drilled, to have dowels put in and to be finished. He testified that the Ledwin leg, Defendant's Exhibit 2, showed wear when brought in for repairs in 1914, and X-ray photographs in evidence, as Defendant's Exhibits 7, 8, 9, and 10, show the crack that was reglued by Beck and the dowel ends put in by Kraft. Kraft also points to new tighteners on this leg put in at that time in place of wood screws originally used.

It remains a matter of conjecture when and how the number came to be placed on the inside of the straps, where it could not be seen without taking the leg apart, when the purpose for which legs were numbered was to enable them to be identified on sight. Ledwin, Nicholson, and Winn testified positively that Defendant's Exhibit 2 was made and sold by Winn to Ledwin in 1904, and the leg was positively identified by Kraft as the leg brought in by Ledwin for repair in 1914, and which showed evidence of much wear at the time. Their testimony agrees in the main, and they impressed the court as sincere and truthful. On the other hand, the testimony of the witness Beck is open to suspicion both on account of his discharge by Winn for reasons not explained, and because of the impression of insincerity in avoiding direct answers and in failing to refer either to the repairs to the Ledwin leg in 1914, to which Kraft testified, or to the shop practice of numbering parts of legs being repaired with the number of a later leg. See Corrington v. Westinghouse Air Brake Co. (C. C. A.) 178 F. 711.

The daily use to which the leg, Defendant's Exhibit 2, was put by Ledwin for ten years, beginning in 1904, was clearly such as is meant by the term *public use* as interpreted by the courts. See Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755. Furthermore, there is ample evidence to show that the sale in 1904 to Ledwin was the first act in what developed into the manufacture and sale of legs of this type.

The defense of estoppel through laches is not necessary to discuss, in view of the conclusion that neither of the legs in evidence of defendant's manufacture infringe the patent in suit. But the conclusion with respect to that defense can be briefly stated.

"Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another," and, where found, may defeat plaintiff's right to recover for infringement committed before the filing of the bill, while leaving the right to an injunction; while "estoppel" effects an extinguishment of the patent right itself, as far as the particular defendant is concerned, leaving no right to an injunction. Geo. J. Meyer Mfg. Co. v. Miller Mfg. Co. (C. C. A.) 24 F.(2d) 505, 507.

It appears that during practically the entire life of the patent the patentee refrained from taking action against the defendant or even notifying defendant that the patent was infringed by the legs being made and sold by defendant.

In George J. Meyer Mfg. Co. v. Miller Mfg. Co., 24 F.(2d) 505, 507 (C. C. A. 7th), in discussing the question of laches in that case, the court said: "The 15 years that elapsed between the date of the issuance of the patent and the commencement of the suit, during which time neither patentee nor his assignee asserted rights under the patent, is so great as to cast upon the appellants the duty of explaining their nonaction. This they did not attempt to do."

The application for the Rowley patent in suit was based upon the so-called Sexton leg made by Rowley in 1900. Rowley did not file his application until after Martin had called on his attorneys in Chicago and showed them what he had. The Sexton leg was the only leg of that kind made at that time. Rowley said that the leg was not made commercially until 1909–1910, and then modified. The particular construction shown and described in the patent for connecting the suspender cords 9 with the lever back check was only an experiment. Rec. 498. As a matter of fact the Sexton leg itself was changed to the outside control of Rowley's earlier patent before it was turned over to the customer. Rec. 491–493. So that, as a matter of fact, the drawings of the applica-

tion do not represent a reproduction of the Sexton leg as actually worn, but merely of the leg when fitted up with the parts that adapted it to be used as an experiment in order to try out the inside control. When Martin brought to Rowley's attention his (Martin's) construction in or about 1907, Rowley, as he expresses it, "went back and obtained from the morgue one of the long, front back checks and put it in, in order to make application for the patent" (Rec. 517); that is to say, in order to enable him to defeat Martin by carrying back his date of invention to the experiment with the Sexton leg in 1900. Rowley won in his interference with Martin, as explained above, and subsequently brought suit against one Wood on a leg similar to Plaintiff's Exhibit 3, one of those on which this suit was brought. Rec. 487–488. But that suit was for infringement of the earlier Rowley patent, No. 644,464. At that time Rowley knew that legs of this type were being made by Winn. Rec. 487–488.

These facts when taken into consideration with the letters written by Rowley to Winn, the delay from 1910, when the patent issued, for several years before the Hanger suit was brought, the bringing of the Wood suit against the Martin leg on the old Rowley patent, rather than this patent in suit, certainly do not furnish excuse for the laches that have occurred in this case. See, also, Dwight & Lloyd Sintering Co. v. Greenawalt (D. C.) 20 F.(2d) 533.

It is held that an accounting is barred by laches. The patent has expired, so that an injunction cannot issue The complaint should be dismissed.